**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| INTERNATIONAL MEZZO TECHNOLOGIES, INC. | ) ) | Civil Action No.3:23-cv-01620-BAJ-RLB |
| Plaintiff | ) | |
| | ) | **JUDGE BRIAN A. JACKSON** |
| versus | ) | |
| | ) | **MAGISTRATE JUDGE RICHARD L.** |
| AIRBORNE ECS, LLC | ) | **BOURGEOIS, JR.** |
| Defendant | ) | |
| | ) | **JURY DEMAND** |

## MEZZO'S OPPOSITION TO INTERGALACTIC'S MOTION TO TRANSFER OR, IN THE ALTERNATIVE, TO DISMISS

Plaintiff, International Mezzo Technologies, Inc. ("Mezzo"), respectfully opposes Defendant, Intergalactic Spaceworx, LLC f/k/a/ Airborne ECS, LLC's ("Intergalactic")[1] *Motion To Transfer, Or, In The Alternative, To Dismiss* ("Motion").

### I.    INTRODUCTION

Intergalactic seeks dismissal of the Complaint on the following bases: (1) lack of specific personal jurisdiction; (2) failure to state a claim for the fifth through ninth causes of action; and (3) improper venue.  However, for the reasons set forth herein, this Court should deny Intergalactic's Motion in its entirety.

As to the question of specific personal jurisdiction, it is of importance that Intergalactic travelled to Louisiana on multiple occasions in order to obtain access to Mezzo's confidential information and trade secrets that Intergalactic later misappropriated.  Intergalactic also engaged in extensive communications with Mezzo in Louisiana in furtherance of its goal to access this information.  Then, after misappropriating Mezzo's confidential information and trade secrets,

---

[1] Mezzo became aware through the course of this litigation that Airborne ECS, LLC has changed its name to Intergalactic Spaceworx, LLC.  Mezzo intends to file the necessary pleadings to reflect the new name of Defendant.

Intergalactic attempted to improperly use its deceptively obtained patent in order to prevent Mezzo from operating in Louisiana and competing in the marketplace. As clearly supported by the case law, these actions subject Intergalactic to this Court's specific personal jurisdiction.

As to Intergalactic's motion to dismiss the fifth through ninth causes of action for failure to state a claim, Intergalactic wrongly alleges that the statute of limitations commences when Intergalactic first had access to Mezzo's confidential information and trade secrets, and fails to consider that the statute of limitations commences when Mezzo actually learned of Intergalactic's bad acts and misappropriations. As set forth herein, Mezzo has timely pled each and every cause of action and has stated the causes of action with the necessary particularity.

Finally, Intergalactic alleges that due to a forum selection clause in a non-disclosure agreement, there is improper venue as to each and every cause of action regardless of whether the causes of action are related to the non-disclosure agreement. However, in reality, the forum selection clause applies to a single cause of action (the breach of contract claim) at the most, and is inapplicable to the remaining eight causes of action. Further, this Court should decline to transfer the breach of contract cause of action as justice is not served by transferring that single count to Washington (a location which none of the parties, witnesses, or evidence are located).

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER INTERGALACTIC DUE TO ITS LOUISIANA-DIRECTED CONTACTS

Intergalactic seeks dismissal of this matter for lack of personal jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(2).[2] However, as described in the Complaint and below, this Court has specific personal jurisdiction over Intergalactic due to its contacts with Louisiana – including personally visiting Louisiana to learn of the technology that Intergalactic now wrongly claims as its own.

---

[2] Rec. Doc. 8-1.

### A.  Specific Personal Jurisdiction

 "In considering a motion to dismiss for lack of personal jurisdiction, the Court must accept the plaintiff's 'uncontroverted allegations, and resolve in [his] favor all conflicts between the facts contained in the parties' affidavits and other documentation.'" *Donelon v. Pollick*, 2021 WL 796145, at *5 (M.D. La. Mar. 2, 2021) (citing *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000)).  "This Court has the authority to assert personal jurisdiction over a nonresident defendant if doing so comports with state law and constitutional due process." *Serv. Steel Warehouse, Co., L.P. v. Eakin*, 2011 WL 3439132, at *1 (M.D. La. Aug. 5, 2011) (citing *Interfirst Bank Clifton v. Fernandez,* 844 F.2d 279, 282 (5th Cir. 1988)).  "Without an evidentiary hearing, the plaintiff satisfies the burden of proof by showing a *prima facie* case for personal jurisdiction." *Id*. (citing *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir.1999)).

"Specific jurisdiction over a nonresident defendant is present where the 'suit arises out of or [is] related to the defendant's contacts with the forum....'" *Serv. Steel Warehouse, Co., L.P.*, 2011 WL 3439132, at *2 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984)). The Fifth Circuit has provided a three-step analysis to determine specific personal jurisdiction:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*McFadin v. Gerber*, 587 F.3d 753, 763 (5th Cir. 2009) (citations omitted).

### B.  Minimum Contacts by Intergalactic with Louisiana Exist

Intergalactic correctly states in its Motion that threats of infringement alone are not sufficient to establish specific jurisdiction.  But, it is only where threats of infringement are the

out-of-state defendant's <u>only</u> activities in the forum state that a defendant is insulated from personal jurisdiction. *Red Wing Shoe Co. Inc. v. Hockerson-Halberstadt, Inc.*, 148 F3d 1355, 1361 (Fed. Cir. 1998). In contrast, in this case, Intergalactic's contacts with Louisiana, including visiting Mezzo's facilities in Louisiana, communicating extensively with Mezzo in Louisiana to obtain the confidential information and trade secrets that form the basis of this suit and sending a cease and desist letter to Mezzo in Louisiana, taken together, meet the minimum requirements of fair play and substantial justice.

In *Electrosource, Inc. v. Horizon Battery Techs., Ltd.,* the Fifth Circuit found the exercise of specific jurisdiction over a foreign defendant was appropriate when that defendant "purposefully initiated multiple continuing contacts with [the plaintiff] in [the forum state] for the purposes of acquiring the know how and the franchise to make" a certain product. 176 F.3d 867, 873 (5th Cir. 1999). The Fifth Circuit held such contacts, accompanied by an agreement between the two parties, "cannot be viewed as random, fortuitous, or attenuated." *Id.* (quotations and citations omitted). The Fifth Circuit emphasized that the defendant "sought out [the plaintiff] for a particular technology that had been developed in [the forum state], negotiated for its acquisition in [the forum state], and began the process of training, designing, and preparation in [the forum state] necessary to the transfer of the technology." *Id.* at 874. Here, Intergalactic similarly sought out Mezzo for its particular technology, Mezzo's laser-welded microtube heat exchanger, and did so in order to unfairly convert themselves from customer to competitor.[3]

Intergalactic's attempt to rely upon *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.* is unpersuasive. *See* Rec. Doc. 8-1 at p. 12. In *Hydrokinetics,* an Alaskan corporation purchased equipment from a Texas corporation in a "single, isolated transaction." 700 F.2d 1026, 1029 (5th

---

[3] *See* Rec. Doc. 1, ¶¶13-20; and Exhibit A, Declaration by Dr. Kevin Kelly, ¶¶ 4-23.

Cir. 1983).  The suit was based on a purchase order contract that stated Alaskan law would apply. *Id.*  When the Texas corporation sued the Alaskan corporation in Texas for breach of the purchase order, the Fifth Circuit determined whether the Alaskan corporation's contacts with Texas were sufficient to exercise personal jurisdiction. *Id.*  The Fifth Circuit found that it was "significant that only a single transaction is involved in this case, governed by Alaska law, which is the defendant's sole contact with the state." *Id.*

In fact, the Fifth Circuit in *Electrosource* distinguished *Hydrokinetics, Inc.* based on the greater quantity and quality of the defendant's contacts with the forum state. *Id.*  The Fifth Circuit emphasized that the parties' agreement called "for an acquisition of knowledge, skill and technology that envisions 'continuing and wide-reaching contacts'" and further "contemplated [the plaintiff] providing assistance and advice in design. . . and [the plaintiff's] monitoring of [defendant's] product uniformity and quality control through activities in both Texas and India." *Electrosource, Inc.,* 176 F.3d 867 at 873.

Like the *Electrosource* case, Intergalactic's contacts with Louisiana are significant in quality and quantity.  Intergalactic sought out Mezzo on its own accord and kept continuous contact with Mezzo for over a year, sought to acquire knowledge of certain microtube heat exchanger technology through samples and tests, and used continued contacts with Mezzo in order to lead Mezzo to believe that it would be engaged to produce laser-welded microtube heat exchangers for various of Intergalactic's projects.[4]  Much like the defendant in *Electrosource, Inc.*, Intergalactic clearly made wide reaching contacts and contemplated future consequences within Louisiana, a significant distinction from the defendant in *Hydrokinetics, Inc.*, who only entered and contemplated a single transaction, a simple purchase order.

---

[4] *Rec. Doc. 1, ¶¶ 13, 17-19; see generally* Ex. A, ¶¶ 4-23.

Further, in *Trimble Inc. v. PerDiemCo LLC*, in a patent declaratory judgment action, the Federal Circuit found that specific jurisdiction was appropriate where a defendant sent a cease-and-desist letter to the plaintiff and ultimately exchanged "twenty-two communications" with the plaintiff "over a period of three months." 997 F.3d 1147, 1156 (Fed. Cir. 2021). The Federal Circuit Court found that the defendant's contact with the forum state "went far beyond 'solely ... informing a party who happens to be located [in Louisiana] of suspected infringement.'" *Id.* at 1157 (citing *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1361 (Fed. Cir. 1998)). Importantly, the Federal Circuit found that the "twenty-two communications over the course of about three months" was "much more akin to 'an arms-length negotiation in anticipation of a long-term continuing business relationship,' over which a district court may exercise jurisdiction." *Id.* (citing *Red Wing Shoe Co.*, 148 F. 3d at 1361).

Intergalactic purposefully directed its activities at Mezzo, a resident of Louisiana, by (1) sending over 275 emails to Mezzo over multiple years,[5] (2) visiting Mezzo's facilities in Louisiana on two separate occasions to examine Mezzo's technologies and operations,[6] (3) requesting and receiving samples of Mezzo's products on several occasions,[7] (4) consulting with Mezzo to use Mezzo's technology in Intergalactic's products,[8] and (5) soliciting information and engineering services from Mezzo regarding Mezzo's technology and designs on numerous occasions.[9]

Intergalactic purposefully initiated multiple continuing contacts with Mezzo in Louisiana for the purposes of acquiring the "know-how" to make laser-welded microtube heat exchangers, making over **ten times** as many communications here as there was in *Trimble*, when the Federal

---

[5] *See* Ex. A, ¶23.
[6] Rec. Doc. 1, at ¶¶ 17, 19; Ex. A, ¶¶ 9, 14.
[7] Ex. A, ¶¶ 8, 12, 18.
[8] Rec. Doc. 1, ¶¶ 13, 17-19; *see generally* Ex. A.
[9] Ex. A, ¶¶ 6, 11, 13, 16, 17, 18, 19.

Circuit found 22 communications over several months to be sufficient contacts. By seeking Mezzo out for its technology developed in Louisiana, Intergalactic purposefully availed itself of the privilege of conducting activities within the forum state, like the defendant in *Electrosource, Inc*.

Further, Intergalactic's attempt to analogize its contacts with Louisiana to the contacts in *Sayers Construction* is also disingenuous. In *Sayers Construction*, the defendants' solicitation of a business relationship with a Texas plaintiff did not constitute purposeful availment of Texas as a forum state because the contractual performance at issue was performed in Florida. *Sayers Constr., L.L.C. v. Timberline Constr., Inc*., 976 F.3d 570, 573 (5th Cir. 2020) ("Here, the place of contractual performance was Florida—not Texas."). The Fifth Circuit noted that the events that gave rise to the suit occurred in Florida, and that "[p]ursuant to the Agreement, [the defendants] picked up work orders from Sayers at its Florida offices and then performed fieldwork in Florida." *Id.* At 572. In contrast, Intergalactic sought out Mezzo in Louisiana, asked for and benefitted from Mezzo's performance of engineering services in Louisiana, sought and received sample products from Louisiana, visited Louisiana to obtain trade secrets and otherwise investigated technologies developed and used in Louisiana, and – based on the numerous proposals – contemplated future contracts with Mezzo that would require future performances in Louisiana.[10]

### C. All Causes of Action Arise Out of or Result From the Intergalactic's Forum-Related Contacts

Mezzo asserts nine causes of action, all of which arise out of Intergalactic's purposeful activities directed at a Louisiana business.

First, the causes of action for Declaratory Judgment of Invalidity of the '670 Patent for failing to meet conditions of patentability, Declaratory Judgment of Invalidity of the '670 Patent for breach of duty of candor to the USPTO, Declaratory Judgment of Invalidity of the '670 Patent

---

[10] Rec. Doc. 1, ¶¶ 13, 17-19; *see generally* Ex. A.

for Failure to Name the Correct Inventor and for Correction of Inventorship of the '670 Patent arise, in part, out of Intergalactic's improper attempt to claim inventorship of technology that it learned of from Mezzo when Intergalactic visited Mezzo's Louisiana facilities.[11]  Intergalactic visited Mezzo's facilities in Louisiana on two separate occasions to obtain an understanding of Mezzo's technologies, inventions, and operations – specifically Mezzo's laser-welded microtube heat exchanger technology.[12]  Intergalactic sought to acquire knowledge of Mezzo's laser-welded microtube heat exchanger technology by making numerous requests for samples and performance tests, thereby obtaining trade secrets and confidential information that Intergalactic then used to shapeshift themselves from Mezzo's customer to Mezzo's competitor.[13] Intergalactic later filed for a patent claiming Mezzo's inventions (which Intergalactic learned of during its visits to Mezzo's Louisiana facilities) as Intergalactic's own.[14]  Intergalactic thereafter sent a cease and desist letter to Louisiana to suppress and put an end to Mezzo's use of those same technologies, inventions, and operations that Intergalactic previously came to Louisiana to learn.[15]

Also, the causes of action for Misappropriation of Trade Secrets Under the Defend Trade Secrets Act and Misappropriation of Trade Secrets under the Louisiana Uniform Trade Secrets Act arise out of Intergalactic's deceptive taking of Mezzo's proprietary information and trade secrets and thereafter applying the same to become a competitor to Mezzo.  In particular, Intergalactic went to great lengths to learn about Mezzo's technologies and operations, including sending several requests for samples and performances tests, and even visited Mezzo's facilities in Louisiana on two separate occasions.[16]  Mezzo sought to protect that proprietary information

---

[11] *See* Rec. Doc. 1, ¶¶ 13, 16-19.
[12] Rec. Doc. 1, ¶¶ 17, 19; Ex. A, ¶¶ 9, 14.
[13] *See* Rec. Doc. 1, ¶¶ 13, 16-19; Ex. A, ¶¶ 6-8, 10-13, 16-19.
[14] Rec. Doc. 1, ¶ 21.
[15] Rec. Doc. 1-1.
[16] Rec. Doc. 1, ¶¶ 13, 17-19; Ex. A, ¶¶ 6-9, 11-14, 16-19.

through a non-disclosure agreement and took Intergalactic at its word when they expressed an interest in being a customer and business partner of Mezzo.[17]  Intergalactic in turn misappropriated that proprietary information and improperly used Mezzo's trade secrets to mold itself into a competitor of Mezzo, instead of the potential customer Intergalactic held themselves out as.[18]

Further, the causes of action for Breach of Contract and Conversion relating to the non-disclosure agreement arises out of Intergalactic's deceptive taking of Mezzo's proprietary information and trade secrets during its visits to Louisiana and thereafter applying same to become a competitor to Mezzo.  Mezzo sought to protect that proprietary information through a non-disclosure agreement and took Intergalactic at its word when they expressed an interest in being a customer and business partner of Mezzo.[19]  Intergalactic in turn misappropriated that proprietary information and improperly used Mezzo's trade secrets to mold itself into a competitor of Mezzo, instead of the potential customer Intergalactic held themselves out as.[20]

Finally, the cause of action of Violation of the Louisiana Unfair Trade Practices and Consumer Protection Act arises out of Intergalactic's deceptive taking of Mezzo's proprietary information and trade secrets which occurred in Louisiana, and thereafter sending a cease-and-desist letter to Louisiana in an attempt to improperly use its patent, which Intergalactic knows it improperly obtained, to exclude Mezzo from the marketplace.[21]

**D. This Court's Exercise of Personal Jurisdiction over Intergalactic is Fair and Reasonable**

Finally, subjecting Intergalactic to personal jurisdiction here, in a federal district where Intergalactic has purposefully directed its activities by (1) seeking the resident Plaintiff for a

---

[17] Rec. Doc. 1, ¶ 17; Ex. A, ¶ 4-5.
[18] Rec. Doc. 1, ¶¶ 12-13, 17-19; 21-27.
[19] Rec. Doc. 1, ¶ 17; Ex. A, ¶ 4-5.
[20] Rec. Doc. 1, ¶¶ 12-13, 17-19; 21-27.
[21] Rec. Doc. 1, ¶¶ 12-13, 17-19; 21-27.

particular technology developed in the forum, and then (2) seeking to suppress the activities of the resident Plaintiff related to that same technology, is fair and reasonable. This Court holds that "[o]nce a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Cooper v. Primary Care Sols., Inc.,* 2017 WL 4544606, at *10 (M.D. La. Oct. 11, 2017); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S. Ct. 2174 (1985) ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.").

In *Electrosource, Inc. v. Horizon Battery Techs., Ltd*, the Fifth Circuit noted several factors to consider in the fairness analysis, including:

> (1) [t]he burden upon the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in securing relief; (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies"; and (5) "the shared interest of the several States in furthering fundamental substantive social policies."

176 F.3d 867, 874 (5th Cir. 1999). The *Electrosource* court noted that the burden of litigation in Texas on an international defendant is considerable, but countered that the defendant voluntarily came to Texas, negotiated and entered an agreement, and began performance of the contract. *Id.* The Fifth Circuit then emphasized that "[u]ndoubtedly, the most efficient forum for the resolution of this conflict would be Texas", and explained that the Court came to this conclusion despite the application of Indian law to the agreement because "the vast majority of the witnesses will be found in Texas, the partial preparation for and termination of [an agreement] occurred in Texas. . . and other evidence concerning the alleged breach is located in Texas." *Id.* The Fifth Circuit found

that any inconvenience the defendant might have suffered would not be a burden "that amounts to a denial of due process." *Id.*

Here, the burden on Intergalactic to litigate patent validity and trade secret claims in Louisiana is fair and reasonable because Intergalactic voluntarily (1) communicated with and visited Louisiana to obtain Mezzo's confidential information and trade secrets in question and to further a business relationship with Mezzo,[22] (2) sought and received sample products produced in Louisiana,[23] (3) requested and considered performance tests conducted in Louisiana,[24] (4) negotiated and entered a non-disclosure agreement with a Louisiana resident,[25] and (5) sent a cease and desist letter to Louisiana to suppress a business local to this federal district.[26] Further, Louisiana "has definite and well-defined interests in commerce and scientific development" and "has a substantial interest in protecting its residents from unwarranted claims of patent infringement." *See Trimble Inc. v. PerDiemCo LLC*, 997 F.3d 1147, 1158 (Fed. Cir. 2021) (citations omitted). Louisiana would also be the most efficient forum for the resolution of this matter, as a majority of the activity in this case occurred at Mezzo's facilities in Louisiana, evidence of the patent validity and true inventorship of the patent is at Mezzo's facilities in Louisiana, witnesses are located in Louisiana, and evidence of what trade secrets were misappropriated is primarily at Mezzo's facilities in Louisiana. Therefore, this court's exercise of personal jurisdiction over Intergalactic is fair and reasonable, and any inconvenience Intergalactic might suffer will not be a burden that amounts to a denial of due process.

---

[22] Rec. Doc. 1, ¶¶ 17, 19; Ex. A, ¶¶ 9, 14.
[23] Ex. A, ¶¶ 8, 12, 18.
[24] Ex. A, ¶¶ 6, 11, 13, 16, 17, 18, 19.
[25] Rec. Doc. 1, ¶ 17; Ex. A, ¶¶ 4-5.
[26] Rec. Doc. 1, ¶ 27; Ex. A, ¶ 24.

Accordingly, the Fifth Circuit's three elements for personal jurisdiction are met here and this Court should deny Intergalatic's motion to dismiss for lack of personal jurisdiction.

## II.    THE NON-PATENT CLAIMS ARE TIMELY PLED AND STATED WITH SUFFICIENT PARTICULARITY AND SHOULD NOT BE DISMISSED

Intergalactic also seeks to dismiss the "non-patent claims" (comprising the fifth through ninth causes of action) as either being time barred or not being pled with particularity.  However, Intergalactic's bases for dismissal are groundless and should be denied in their entirety.

### A.  The Misappropriation of Trade Secrets Claims (Fifth and Sixth Causes of Action) Accrue on Discovery and are Timely Pled

Mezzo makes claims for the misappropriation of trade secrets under Federal law, the Defend Trade Secrets Act ("DTSA") and under Louisiana law, the Louisiana Uniform Trade Secrets Act ("LUTSA").  Both claims have a statute of limitations of three years from when the misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C.A. § 1836; La. R.S. § 51:1436 (citing verbatim).

"It is well established that the limitations period for a given claim of misappropriation begins to run when it is discovered or reasonably discoverable." *B&P Littleford, LLC v. Prescott Mach., LLC*, No. 20-1449, 2021 WL 3732313, at *7 (6th Cir. Aug. 24, 2021) (citations omitted). "The goal of this rule is not to pressure the owner of a trade secret to file suit prematurely, but rather to ensure such an owner 'conduct[s] a timely and reasonable investigation after learning of possible misappropriation.'" *Id.* (citations omitted). The obligation to investigate after discovery is "wholly consistent with the nature of trade secrets; because trade secrets are not subject to a filing system, owners' diligence in taking affirmative steps to protect them is crucial*." Id.*

Intergalactic claims that the statute of limitations began running when Intergalactic visited Mezzos' facilities in 2017 or 2018. However, Mezzo did not know that Intergalactic intended to

misappropriate Mezzo's trade secrets at that time – rather, at that time Mezzo believed Intergalactic to be a potential customer who was interested in working with Mezzo.[27] It was not until recently, following the receipt of the cease and desist letter in August of 2023 and notice of issuance of Intergalactic's patent in December 2022, that Mezzo realized that Intergalactic became a competitor, and did so by misappropriating Mezzo's laser-welded microtube heat exchanger technology and trade secrets that made Mezzo attractive to Intergalactic as a business partner a few years before.[28]  Notably, Intergalactic failed to address the discovery element of the statute of limitations in its Motion to Dismiss -- likely because Mezzo clearly discovered the misappropriation of trade secrets well within the three-year statute of limitations for both DTSA and LUTSA.  *See* 18 U.S.C.A. § 1836; La. R.S. § 51:1436.

### B.  The Misappropriation of Trade Secrets Claims (Fifth and Sixth Causes of Action) are Pled with Sufficient Particularity

"Courts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets." *Yeiser Rsch. & Dev. LLC v. Teknor Apex* Co., 281 F. Supp. 3d 1021, 1043–44 (S.D. Cal. 2017) (citing *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 755 F.Supp. 635, 636 (D. Del. 1991); *see also Sonrai Sys., LLC v. Waste Connections, Inc.,* 658 F. Supp. 3d 604, 614 (N.D. Ill. 2023); *PeopleFlo Mfg., Inc. v. Sundyne, LLC*, No. 20 CV 3642, 2021 WL 3129264, at *6 (N.D. Ill. July 23, 2021) ("At the pleading stage, the complaint can describe trade secret information in general terms.").

Further, "to require [the plaintiff] to identify its trade secrets with granularity at this stage of the case could thus risk requiring [the plaintiff] to define its trade secrets too narrowly" thereby

---

[27] Rec. Doc. 1, ¶¶ 13, 17-19; *see generally* Ex. A.
[28] Rec. Doc. 1, ¶¶ 26-28.

incidentally limiting the claim and risking that the identified secrets may "miss what the defendant is doing." *Deloitte Consulting LLP v. Sagitec Sols. LLC,* 2023 WL 6039069, at *5 (D. Del. Sept. 15, 2023). "Moreover, because it is the defendant who knows what it misappropriated, a plaintiff should not be required to plead with specificity all of its possible trade secrets in order to proceed to discovery." *Yeiser Rsch. & Dev. LLC,* 281 F. Supp. 3d at 1044 (citing *T–Mobile USA, Inc. v. Huawei Device USA, Inc*., 115 F.Supp.3d 1184, 1193 (W.D. Wash. 2015).

On the other hand, "courts generally require sufficient pleading such that the other party is on notice of what it is alleged to have misappropriated." *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., Inc*., 780 F.Supp.2d 1061, 1078 (D. Haw. 2011). Here, Mezzo has provided sufficient particularity of what Intergalactic has misappropriated – "proprietary information, data, and methods of manufacture relating to the design and manufacture of microtube heat exchangers" – and supplemented that identification by highlighting the technology found in Claim 1 of the '670 Patent.[29] Mezzo further expressed that the use and manufacturing of that particular technology, a laser welded microtube heat exchanger, is integral to the trade secrets and operations of Mezzo, and the kind of proprietary information the non-disclosure agreement was intended to protect.[30] Mezzo has sufficiently pled what trade secrets it alleges Intergalactic to have misappropriated, any further specificity would risk the public disclosure of the specific elements of Mezzo's use and manufacturing of a laser welded microtube heat exchanger.

### C.  Breach of Contract Accrues from Notice of Breach and is Timely Pled

Regardless of whether Louisiana or Washington law applies to the breach of contract claim arising from the non-disclosure agreement, the discovery rule will apply again here and thus the

---

[29] *See* Rec. Doc. 1, ¶¶ 21, 44 and 55.
[30] *See* Rec. Doc. 1, ¶ 17 (noting that the non-disclosure agreement was entered into in response to Airborne's inquiry about Mezzo's "laser welded microtube heat exchangers" and in anticipation of Airborne's visit to Mezzo's facilities where the laser welded microtube heat exchangers are used and manufactured).

statute of limitations will not begin to run until Mezzo discovered or should have discovered of the other party's breach. The Revised Code of Washington provides a six-year statute of limitations for actions based on written agreements. Wash. Rev. Code § 4.16.040. A Washington Appellant Court explained that "[g]enerally, the statute of limitations in a contract action begins to run at the time of breach. Under the discovery rule, however, the 'statute of limitation for contract actions begins to run when a party knows or, in the exercise of due diligence should know, of the other party's breach.'" *Wm. Dickson Co. v. Pierce Cnty.,* 128 Wash. App. 488, 495, 116 P.3d 409, 414 (Wash. App. Div. 2 2005). "In Louisiana, breach of contract claims are generally 'subject to liberative prescription of ten years' measured from the date of the alleged breach." *N. Frac Proppants, LLC v. Regions Bank, NA*, 600 F. Supp. 3d 644, 651 (M.D. La. 2022) (citing La. C.C. art. 3499). Thus, the breach of contract claim is clearly not prescribed by Washington nor Louisiana law.   Again, Intergalactic did not address the discovery element to the statute of limitations in its Motion to Dismiss; likely because it is clear that Mezzo discovered the breach of the non-disclosure agreement well within the six-year statute of limitations under Washington law and the ten-year statute of limitations under Louisiana law.[31]

### D.  Conversion Accrues from Notice of Breach and is Timely Pled

Once again, Intergalactic has ignored the discovery rule in asserting Mezzo's conversion claim is time-barred.  This Court holds that "[p]rescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort[.]" *H&E Equip. Servs., Inc. v. St. Germain*, No. CV 19-134-SDD-EWD, 2020 WL 1678327, at *5 (M.D. La. Apr. 6, 2020). This Court recently found that a "Plaintiff's conversion claim did not begin to accrue until it had actual or constructive knowledge of the grounds for its

---

[31] *See* Rec. Doc. 1, ¶ ¶26-27.

claim." *Id.* Where the plaintiff filed suit within a year of when he alleged to have discovered the conversion, the court found that the claim had not prescribed by virtue of the discovery rule. *Id.*

Intergalactic also failed to note that the First Circuit of Louisiana has since corrected its *CamSoft* ruling as it concerns "immovable, intangible information" in the context of a conversion claim – finding that "the *CamSoft* court's categorization of that information as an 'immovable, intangible' thing appears to be in error because an 'immovable, intangible' thing is an incorporeal immovable, which the Louisiana Civil Code defines as a right to immovable property," and further holding that "The Supreme Court's decision in *South Central Bell*, and not *CamSoft*, governs our consideration of the electronic data in this case and its classification as tangible property." *Intelligent Mortg. & Consulting Servs. LLC v. Arbor Lending Grp., L.L.C.,* 2022-1252 (La. App. 1 Cir. 8/1/23), 371 So. 3d 554, 565 at n.11, *writ denied,* 2023-01210 (La. 11/15/23), 373 So. 3d 80. The First Circuit explained that "[t]he *CamSoft* decision is also at odds with established Louisiana precedent that electronic data, when recorded or reduced in a physical format, is a tangible, corporal movable." *Id.* (citing *South Central Bell,* 643 So.2d at 1246, and *State v. Williamson,* 2010-466 (La. App. 5th Cir. 12/13/11), 81 So.3d 156, 166 (recognizing that conversion protects digital or electronic property); *First American Bankcard, Inc. v. Smart Bus. Tech., Inc.,* No. CV 15-638, 2016 WL 5869787 at *6 (E.D. La. Oct. 7, 2016) (rejecting the argument that digital information stored on the cloud is not subject to conversion under Louisiana law)); *All Green Corp. v. Wesley*, No. CV 20-0121, 2021 WL 314290 at *6 (W.D. La. Jan. 29, 2021) (under Louisiana law, digital information may be the basis for a conversion action when it is of a type that is "capable of being merged into a physical document.")).

Regarding Intergalactic's claim of preemption, Intergalactic failed to identify the contrary ruling coming from this court. In *H&E Equip. Servs., Inc.*, this court acknowledged that "[w]hile

'the plain text of LUTSA would preclude a civilian law conversion claim involving confidential information that qualifies as a trade secret under LUTSA,' conversion claims involving information that does not qualify as a trade secret are not preempted." *H&E Equip. Servs., Inc. v. St. Germain,* 2020 WL 1678327, *6 (M.D. La. Apr. 6, 2020). "Confidential information and trade secrets are not the same[,]" thus, Mezzo's conversion claim is not preempted by LUTSA. *Id.*

### E.  Intergalactic Mischaracterizes Mezzo's Claim under the Louisiana Unfair Trade Practices Act

Intergalactic concludes in error that Mezzo's only basis for recovery under LUTPA is a threat of litigation.  Intergalactic fails to recognize that paragraph 74 of the Complaint "repeats and incorporates by reference the allegations of paragraphs 1-28" and that the basis for the cause of action under LUTPA includes more than paragraphs 75 and 76.[32]  Specifically, under the guise of being a potential customer, and with Mezzo's guard lowered by having a non-disclosure agreement in place that put Intergalactic in a contractual position of trust, Intergalactic deceived Mezzo to extract every ounce of knowledge they could about Mezzo's use and manufacture of laser welded microtube heat exchangers.[33]  Like the infamous trojan horse, Intergalactic used a goodwill offering of potential business to infiltrate Mezzo's facilities and obtain otherwise protected proprietary information.  Further, and as also described in detail in the Complaint, Intergalactic then goes on to misuse its patent to in an attempt to unfairly exclude Mezzo from the market.[34]

The trojan horse tactics of Intergalactic are the exact kind of "deceptive method, act, or practice" LUTPA is designed to protect against. *See* La. R.S. 51:1409. The Fifth Circuit has found that LUTPA provides an action for "[a]ny person who suffers any ascertainable loss of money or

---

[32] Rec. Doc. 1, ¶ 74.
[33] Rec. Doc. 1, ¶¶ 12-26.
[34] Rec. Doc. 1, ¶¶ 26-28.

movable property, corporeal or incorporeal, as a result of the use or employment by another person

of an unfair or deceptive method, act or practice[.]" *Reingold v. Swiftships, Inc.,* 126 F.3d 645,

652–53 (5th Cir. 1997). Notably, "LUTPA leaves particular determinations of what is an 'unfair

or deceptive method, act or practice' largely to the courts to decide on a case-by-case basis." *Id*.

at 53.  "Louisiana courts have interpreted these terms to include 'a practice that is unethical,

oppressive, unscrupulous, or substantially injurious[.]'" *Id.*  "Significantly, however, under the

LUTPA the Louisiana courts appear to zealously guard against allowing managers, employees,

and persons in a special position of trust to profit from its wrongdoing." *Id.*

In *Reingold v. Swiftships, Inc*., a plaintiff sufficiently alleged a LUTPA claim against a

defendant by showing that the defendant intentionally defrauded the plaintiff by using the

plaintiff's designs to construct his own product without the plaintiff's knowledge or consent, and

thereafter refused to compensate the plaintiff for the surreptitious uses of the plaintiff's design.

126 F.3d at 653 ("Reingold specifically alleges that these deliberate acts of fraud and

misappropriation constitute unfair trade practices under the LUTPA. We agree.").  The Fifth

Circuit found that "Swiftships intentionally persists in the deception that its [product] was derived

from independent plans rather than from Reingold's trade secret; and Swiftships fully intends to

continue to unjustly enrich itself to the competitive disadvantage of Reingold." *Id.*  In the context

of a summary judgment review, the Fifth Circuit held "this course of intentional and fraudulent

conduct was clearly a violation of the LUTPA." *Id.*

Similarly, the course of intentional and fraudulent conduct by Intergalactic described in the

Complaint and herein is clearly a violation of the LUTPA.

**III.    THE FORUM SELECTION CLAUSE IS INAPPLICABLE TO THE MAJORITY OF THE CAUSES OF ACTION & ENFORCING THE FORUM SELECTION CLAUSE IS NOT IN THE INTEREST OF JUSTICE**

**A.  The Forum Selection Clause Applies to Only a Fraction of the Counts.**

Before this Court determines whether the forum selection clause (providing for venue in King County of Washington State) should be enforced, it must first identify what causes of action are subject to the forum selection clause.  Venue must be proper as to each cause of action.  *See Stafford v. Stanton*, 2018 WL 5904495, at *2 (W.D. La. Nov. 9, 2018); see also *Int'l Pat. Dev. Corp. v. Wyomont Partners*, 489 F. Supp. 226, 230 (D. Nev. 1980) ("in cases presenting more than one cause of action…venue must be proper as to each.") (citing Wright, Miller & Cooper, Fed. Pract. & Proc.: Jurisdiction, s 3808; 1 Moore's Federal Practice P 0.142(3) at p. 1384).

Without or without a forum selection clause, 28 U.S.C. 1391 governs whether venue is proper.  28 U.S.C. 1391(b) provides that "A civil action may be brought in--

> **(1)** a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
> **(2)** a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
> **(3)** if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. 1391(b).  "Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55 (2013).  Notably, it appears from the public records that Intergalactic does not reside in King County, Washington (and rather was formed in Utah and maintains its principal place of business in Utah)[35] and none of the nine causes of action assert that any part of the events or omissions giving rise to the claims occurred in King County, Washington.

---

[35] *See* Exhibit B, State of Utah Business Search – Intergalactic; Exhibit C, State of Utah Business Search – Airborne ECS; Exhibit D, State of Washington Business Search – Airborne ECS.

To determine whether the forum-selection clause applies to the claims asserted in the Complaint, courts "look to the language of the parties' contract to determine which causes of action are governed by the forum selection clause[]." *Mendoza v. Microsoft, Inc.,* 1 F. Supp. 3d 533, 547 (W.D. Tex. 2014) (citing *Marinechance Shipping, Ltd. v. Sebastian,* 143 F.3d 216, 222 (5th Cir.1998)). "If the substance of the plaintiff's claims, stripped of their labels, does not fall within the scope of the forum selection clause, the clause cannot apply." *Id.*

Out of Mezzo's nine causes of action identified in the Complaint, eight of the causes of action are clearly not subject to the forum-selection clause of the non-disclosure agreement. The first four causes of action related to patent invalidity and patent correction are unrelated to the nondisclosure agreement and are in no way governed by the terms of the agreement. The Federal Circuit agrees with this conclusion, noting that "a finding that a party has breached an NDA is devoid of undertaking any patent-related determinations such as infringement or validity." *Kannuu Pty Ltd. v. Samsung Elecs. Co.,* 15 F.4th 1101, 1108 (Fed. Cir. 2021). The Federal Circuit explained that "an invalidated patent or non-infringement determination does not change, disrupt, or otherwise impact the parties' NDA obligations." *Id.* "Given that patents are necessarily designed to publicly disclose enough information for a skilled artisan to make and use the claimed invention" while non-disclosure agreements are designed to protect confidential information from public disclosure, the non-disclosure agreement's forum selection clause does not apply to the four causes of action concerned with the validity and correct authorship of the '670 Patent. *Kannuu Pty Ltd.,* 15 F.4th at 1108.

Further, the violation of the Louisiana Unfair Trade Practices Act is not governed by the forum selection clause. As discussed above, LUTPA provides an action for "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result

of the use or employment by another person of an unfair or deceptive method, act or practice[.]" *Reingold v. Swiftships, Inc.,* 126 F.3d 645, 652–53 (5th Cir. 1997).  Whether Intergalactic breached the non-disclosure agreement does not consider or anyway help determine whether Intergalactic used deceptive methods to harm Mezzo nor does it answer whether Intergalactic's conduct toward Mezzo qualifies as "a practice that is unethical, oppressive, unscrupulous, or substantially injurious[.]" *Id.* at 653.  Also, the DTSA claim, LUTSA claim, and conversion claim are concerned with the *unlawful taking and use* of proprietary information, not the public disclosure of that proprietary information.  Thus, the non-disclosure agreement's forum selection clause only feasibly applies to the breach of contract claim and the remaining eight claims are not subject thereto.

### B.  Creating a Multiplicity of Litigation is Not in the Interest of Justice

28 U.S.C. 1404(a) provides: "For the convenience of the parties and witnesses, *in the interest of justice*, a district court may transfer any civil action to any other district court or division where it might have been brought." 28 U.S.C. 1404(a) (emphasis added).  The Supreme Court explained that "[a] forum-selection clause may be enforced by a motion to transfer under § 1404(a)[.]" *Atl. Marine Const. Co.*, 571 U.S. at 52.

Federal law governs the enforceability of forum selection clauses, and federal jurisprudence requires that such clauses be reasonable to be enforceable. *City of Westlake v. Republic Fire & Cas. Ins. Co.,* 664 F. Supp. 3d 665, 671 (W.D. La. 2023) (citing *Alliance Health Group, LLC v. Bridging Health Options, LLC*, 553 F.3d 397, 399 (5th Cir. 2008)). "[Forum selection] clauses are considered prima facie valid and enforceable unless they are shown to be unreasonable." *Id.* (citing *In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299, 306 (5th Cir. 2013).

In the typical suit without a forum selection clause, the party requesting a transfer must establish good cause to do so, wherein the court considers a number of "not necessarily exhaustive

or exclusive" private and public interest factors. *Haughton v. Plan Adm'r of Xerox Corp. Ret. Income Guarantee Plan*, 2 F. Supp. 3d 928, 936–37 (W.D. La. 2014) (citing *In re Volkswagen of Am., Inc.,* 545 F.3d 304, 315 (5th Cir.2008) (en banc)). When a suit is based on a contract with a forum selection clause, the Plaintiff's choice of forum is accorded no weight, the private interest factors are ignored, and the case's choice of law rules will change to transferee's choice of law if transferred. *Id.* Therefore, only the public interest factors are left to consider in determining whether there is good cause to transfer. *Id.; see Atl. Marine Const. Co* 571 U.S. at 487 (finding that "a district court may consider arguments about public-interest factors only").

Those public interest factors are:

(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law."

*Id.* (citing *In re Volkswagen of Am., Inc.,* 545 F.3d 304, 315 (5th Cir.2008) (en banc)). Here, the public interest factors weigh in favor of refusing Intergalactic's transfer request because Louisiana has an interest in having localized disputes, regarding homegrown technologies, decided at home. Louisiana will also be familiar with the state laws that govern several causes of action in this case, including the Louisiana Unfair Trade Practices Act and the Louisiana Uniform Trade Secrets Act.

Notably, the Western District of Washington, the federal district court Intergalactic is seeking to transfer a fraction of this case to, recently expressed that it is in the interest of public policy to avoid burdening citizens in an unrelated forum with jury duty and transferred a case out of the Western District because the case "has no discernible connection to the Western District" and thus public policy favored a transfer. *Cruz v. Ferry Cnty.,* No. C20-729 MJP, 2020 WL 3872170, at *2 (W.D. Wash. July 9, 2020) (holding that "because this case is exclusively concerned with events that occurred in the Eastern District and has no discernible connection to

the Western District, the Court finds that public policy factors—particularly the local interest in deciding local controversies and not burdening citizens in an unrelated forum with jury duty—favor transfer.") (citations omitted).

Even more notable is the fact that Intergalactic is no longer domiciled in Washington and no longer has any employees or facilities in Washington.[36]  According to Intergalactic's website addressing their recent name change, "[i]n 2019, RAM Company bought a controlling stake in Airborne ECS and moved the company from Port Angeles, Washington, to St. George, Utah."[37] Nothing in this case -- be it parties, evidence, alleged activities, or damages – is in or related to Washington. Transferring any portion of this case to a Washington court will burden the forum's citizens, and its court system, with a matter wholly unrelated to the forum.

Further, "[i]n determining whether a transfer is 'in the interest of justice' under § 1404(a), courts seek to avoid a multiplicity of litigation resulting from a single transaction or occurrence." *Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173, 206 (D. Mass. 2016) (citing *Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 25–27, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960); 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3854 (4th ed. 2015) (collecting cases)).  The Supreme Court found that "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Continental Grain Co.*, 364 U.S. at 26.

In *Get In Shape Franchise, Inc. v. TFL Fishers, LLC,* a Massachusetts court was left to determine whether to enforce a franchise agreement's forum selection clause providing for a

---

[36] *See* Exhibit B, State of Utah Business Search – Intergalactic; Exhibit C, State of Utah Business Search – Airborne ECS; Exhibit D, State of Washington Business Search – Airborne ECS.
[37] *Here's Why We Changed Our Name to Intergalactic*, INTERGALACTIC (April 26, 2021), https://ig.space/commslink/heres-why-we-changed-our-name-to-intergalactic.

Massachusetts venue, where Indiana was also a proper venue for the broader trademark infringement claims in addition to the breach of contract claims arising from the franchise agreement, and where a substantial part of the events that gave rise to the claims occurred in Indiana. 167 F. Supp. 3d 173 (D. Mass. 2016). The *Get In Shape Court* held that "the public interest factors weigh strongly in favor of transferring this case to Indiana", first noting that a substantial part of events giving rise to the claims occurred in Indiana, and then emphasizing that the broader trademark claims could only be brought in Indiana. *Get In Shape Franchise, Inc.,* 167 F. Supp. 3d at 205. The Court also found that "Indiana has a strong interest in deciding this case because the Indiana Deceptive Franchise Practices Act" and determined that an Indiana court will be "better equipped" to determine what constitutes a violation of the Indiana Deceptive Franchise Practices Act. *Id.* at 205-06.

Finally, the *Get In Shape* Court addressed the issue of avoiding the multiplicity of litigation, adding that "Courts place substantial weight on this factor, and find that transfer is appropriate where there is a likelihood of substantial overlap in issues between two lawsuits pending in two different federal courts." *Id.* at 206; citing *Delong Equip. Co. v. Washington Mills Abrasive Co.,* 840 F.2d 843, 857 (11th Cir.1988) ("Given the judicial system's great concern with the efficient conduct of complex litigation, an important consideration in deciding appropriate venue is whether a forum can meet the personal jurisdiction and venue requirements for most or all of the defendants in a multi-party lawsuit."). The *Get In Shape* Court ultimately found that it was in the interest of justice to transfer both the trademark claims (because the Massachusetts court lacked personal jurisdiction) and the state law claims (despite being subject to the forum selection clause) to Indiana "to avoid multiplicity of litigation from a single transaction or occurrence and because Indiana has a strong interest in applying Indiana law in this case." *Get In Shape Franchise,*

*Inc. v. TFL Fishers, LLC,* 167 F. Supp. 3d 173, 207 (D. Mass. 2016).

Intergalactic's transfer request would create a multiplicity of litigation that is wholly unnecessary and is frankly unwanted by the potential transferee venue. *See Cruz v. Ferry Cnty*., No. C20-729 MJP, 2020 WL 3872170, at *2 (W.D. Wash. July 9, 2020).  A substantial part of events giving rise to the claims occurred in Louisiana, and the patent invalidity and LUTPA claims can only be brought in Louisiana.  Louisiana has a strong interest in adjudicating a LUTPA claim and will be "better equipped" than Washington to do so.  Further, Washington has an interest in avoiding the burden of adjudicating a matter wholly unrelated to the forum.  Therefore, in the interest of justice, Intergalactic's transfer request should be denied.

## IV.    CONCLUSION

Mezzo has made its prima face case of the exercise of specific personal jurisdiction over Intergalactic.  Mezzo has also shown that venue in Louisiana is reasonable and proper, and that all the claims have been sufficiently pled.  For these reasons, this Court should deny Intergalatic's Motion in its entirely.

Respectfully submitted,

CARVER, DARDEN, KORETZKY, TESSIER
FINN, BLOSSMAN & AREAUX, L.L.C.

/s/ *Emily L. Gummer*
Emily L. Gummer (La. Bar. No. 33858)
Kyle J. E. Koch (La. Bar. No. 39942, Middle
District of Louisiana admission forthcoming)
1100 Poydras Street, Suite 3100
New Orleans, Louisiana 70163-1102
Telephone: (504) 585-3821
Facsimile:  (504) 585-3801
Email: gummer@carverdarden.com
Email: koch@carverdarden.com
*Attorneys for International Mezzo*
*Technologies, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to Plaintiffs and Defendants' counsel  I further certify that I mailed by first class mail and electronic mail the foregoing Opposition and the notice of electronic filing to any non-CM/ECF participants.

_/s/ Emily L. Gummer_____
Emily L. Gummer
